Good morning, ladies and gentlemen. Our first case for argument is United States v. Farias. Ms. Sardouki. Good morning, Your Honors. Nina Sardouki on behalf of Jose Farias, who is appellant in United States v. Farias. At the time of the trial, at one point, VA agent Alarcon testified to voice identification. And one of the basis for his identifying the defendant as someone who spoke on the tapes was based on overhearing the defendant speak off the record but at trial. At that point, the trial attorney, Mr. Lopez, objected and there was a sidebar. Agent Alarcon basically testified that he heard the defendant speak on Thursday of last week in Spanish. At the time, the presiding judge struck the last part of the sentence in Spanish based on trial attorney's objection. The question here is, how similar is this case to the Seventh Circuit case, U.S. v. Jones? In Jones, it was very clear that they had overheard a conversation between the defendant and his lawyer. What's the evidence here, especially in light of the district court's explicit finding that it wasn't based on a conversation with his attorney? What's your strongest evidence otherwise? Because without that, this is a very different case than Jones. We agree, Your Honor, that Jones, on the record itself, had far more evidence that this was an overheard conversation. A few things here, Your Honor. First... And address, if you would, please, in your response, how the district court's finding otherwise was clearly erroneous. My recollection, Your Honor, of what the district court found in the transcript of the post-trial motions in September of 2024 was the defendant spoke a number of times loudly in Spanish in the courtroom, rather than that this particular instance was not that with his attorney. My recollection of that hearing was that the district court said that he heard the defendant speak loudly in Spanish many times to, I believe, a number of people in the courtroom. Jones does not say that that's a Sixth Amendment violation. What makes you think that that would be a Sixth Amendment violation if the defendant was just speaking to his lawyer in a voice that an agent was able to overhear in the courtroom? Jones doesn't say it. It says it's problematic. It doesn't say that's a Sixth Amendment violation. What would make you think that it was? I mean, how would we conduct trials in the United States? Would the defendant raise his hand, and then the judge would send the jury out, and everybody out of the courtroom would put the lawyer? I mean, how would we do it if nobody else could not—it's not just hear what the defendant was saying or decipher what the defendant was saying, but hear the defendant's voice in the courtroom? Your Honor, two things. Our primary argument here is in the conflict of interest if this was found to be a conversation between the defendant and the attorney, in that I think that Jones, correct, is not focusing on the Sixth Amendment violation. We don't claim necessarily that this was per se a Sixth Amendment violation. Our primary argument—although we do come to that as an option. But our primary argument here is that there is evidence here, and I would like to address Judge St. Eve's argument, that there was evidence here that this was attorney-client conversation, first of all, and second, if it was attorney-client conversation, that it created a conflict of interest that was untenable, in that the only way to address anything about this conversation, the loudness, how long it lasted, would have been for the attorney who participated in this conversation to take the stand, or the defendant to take the stand, and the defendant took the Fifth Amendment. So that's the primary argument. I thought your primary arguments were based on the Fifth and Sixth Amendment. No, Your Honor, that is the second argument in case this was found not to be attorney-client conversation. Then we're trying to say as to fairness and as to policy, whether there is some tension here between Fifth and Sixth Amendment, in that it creates a situation in the courtroom at trials that defendants are reluctant to speak for fear that in the last minute their voices might be used, and with lack of notice, they would have to be witnesses in their own case. Should they want to claim Fifth Amendment rights? Let's say that this wasn't an attorney-client conversation. Let's say this was just a defendant speaking very loudly in court. Is there an issue here because it's trial? In the last minute, defendant hears, oh, I compared it to his voice from last Thursday when he spoke loudly at trial off the record. Defendant wants to protect himself and doesn't want to testify. Who then gets to challenge that other than defendant having to take the stand? Is your Fifth Amendment argument that your client somehow had a privacy interest in his voice? No, Your Honor. It is not. Okay. The Fifth Amendment argument is basically based on justice in public policy, fairness, rather than we understand that there is no protection in his voice. What does that have to do with the Constitution? I'm sorry? What does that have to do with the Constitution? None, Your Honor. This is the argument that was presented in the first post-trial. I don't see why we're having trouble figuring out what your argument is. It seems to wander from place to place. The first part of the argument is absolutely that this was an attorney-client conversation and that this was a conflict of interest. If that's the heart of your argument, again, what is the evidence in the record that this was an attorney-client conversation? A few things, Your Honor. First, in Spanish. That was the difference between what... There are going to be a few. First is in Spanish. That is the difference between what was offered as proof the day before when the agent testified outside of the jury. That part was missing. Did your client even speak English? I communicated with him in English. The attorney, Mr. Lopez, I believe the trial attorney communicated in Spanish because he speaks Spanish. I communicate with my client now in English, and I believe he understands English. That is why I believe the trial attorney was very adamant that this must have been a conversation between him and the defendant because it was in Spanish. And I think that is the key word here that was added when Agent Alarcon actually took the stand. A few other things point out to it. When Mr. Lopez immediately objected, he objected to this being identifying my client's voice during a court proceeding. He objected based on understanding this was a conversation between him and the defendant. The court understood it as such as well. The court immediately said... But the court corrected that. Initially the court said something about it being with the attorney based on what Mr. Lopez said. But the court subsequently corrected that and said that it made a factual finding that on multiple occasions outside the presence of the jury with a variety of people, whether it was the marshal or some of the spectators, that he heard him speaking loudly and in Spanish. And that's the factual finding. In order to find for you that this was an attorney-client privilege, that finding would have to be clearly erroneous. And I haven't heard anything supporting that that finding was clearly erroneous. Your Honor, it's not our position that that finding was clearly erroneous, but it doesn't exclude that that conversation that Mr. Lopez thought on Thursday last week in Spanish was actually between Mr. Lopez and the defendant because it was so close in time. We have things on the record that point to Mr. Lopez believing this to be his conversation that happened in 2021. What the judge took as factual finding was in 2024. And we don't say it's erroneous, but we're saying it with the passage of time. What was on the record in 2021 that Mr. Lopez put on the record is more likely to have related to that conversation, and that is that Mr. Lopez believed that this was between him and his clients. Further on, even the government considered that based on Mr. Lopez's And we admit, based on Mr. Lopez's statement that this was a conversation between him and his client, that it was their position, too, that this was they took that argument, should I correct it, they took that argument and developed it with the assumption that this was a conversation between Mr. Lopez and the defendant. Can I have one more? I'm just confused. Is your conflict of interest argument that nobody could testify that it wasn't the defendant's voice? I'm not following the conflict of interest argument. Your Honor, in Jones, the court said when a part of the identification is based on overhearing a conversation in court based on the attorney-client conversation, not disclosing the content. Then only the attorney or the defendant can testify. Exactly. But that's not what the agent testified here. The agent just simply testified that he recognized the defendant's voice. The defendant could have called one of probably a thousand people to testify that he didn't have to do this, of course, but he could have called one of a thousand people to testify it wasn't his voice on the phone calls, right? My understanding is the agent testified that he compared the voice on the phone calls to exemplars, but also to overhearing the defendant speak in court. And the question is, compared to Jones, whether asking any questions and exploring the territory or whether that's even correct. Yeah, I understand. I understand. That the only two people who could take this and challenge it on such a short notice would have been attorney or the defendant. Right, but he never testified that he overheard. He testified that he overheard the defendant speaking in court, but he didn't testify that he overheard the defendant speaking to his lawyer in court. Correct, Your Honor. That's a big difference. It is a big difference, but we're relying on the record on the sidebar as well as subsequent record in the first four trial motions to support the argument that Mr. Lopez, if he were here today— Why didn't the defendant question the agent outside the presence of the jury to try to make this record? I don't have the answer to that. I was not there for the trial, Your Honor. I see that I have three minutes. I'm going to use the next minute and a half and reserve only two minutes for my rebuttal to touch upon the issue of whether, based on United States v. Cruz Rea and United States v. Nunez, the court in the circumstances of Spanish reporting— Can I ask you a question, but I'm just going to get to the heart of this? What do you think was wrong about the jury instruction? What do you think the instruction should have said? I think, based on the amount of argument that went into what's primary evidence, the jury instruction should have said, or the judge should have corrected himself so sponte, that tapes are the primary evidence. Not in this case, though, because the transcripts came in as substantive evidence. We don't have Tier 1 substantive evidence and Tier 2 substantive evidence. The defense counsel did not object to the transcripts coming in. The other problem you've got is we tell jurors if they understand Spanish, they don't use their Spanish interpretation. Correct, Your Honor. The transcripts were the evidence in this case. You're stuck with that. I also think that the tapes were introduced— They were. —into evidence. So what you're arguing is the tapes are Tier 1 substantive evidence and the transcripts are Tier 2 substantive evidence. They weren't only demonstrative exhibits in this case, like they usually are. Correct, Your Honor. What we're relying here is on Cruz Rea, which is also the case where English transcripts and Spanish recordings were entered into evidence. This court said when a district court admits a transcript into evidence, the court must instruct the jury that the tape is the primary evidence and that the transcript is given to assist the jury in evaluating the recordings. Why haven't you waived that argument? Why haven't you waived your jury instruction argument? You had multiple opportunities to object during the course of the trial, during the jury instruction conference, and you never objected. The court gave additional opportunities to submit additional instructions. You didn't do that. And your client expressly agreed to remove that language that you now want from a separate instruction. Your Honor, I don't have an answer to that. I wasn't there at trial, but I can say— It's not why it was done. It's why doesn't that waive. And I will get to that answer now because I have a minute and 20 seconds. I think because I agree that as far as the jury instruction per se, it's waived. But the argument itself as to whether the court could have so sponte, considering that it never addressed the objection of the government to Mr. Lopez's, this is primary evidence, the transcripts are there only to aid you, the court never ruled on that. There was an objection by the government. The court never said sustain or overruled. I think considering how much Mr. Lopez objected to the exhibits 301 to 318, demonstrative exhibits, there was plenty of— But he didn't object to the admission of the transcripts. To the original transcripts that did not have identified names. Right. That's the transcript of the English translation of the Spanish call, and he did not object to that being admitted as substantive evidence. Correct, but he did object to the demonstratives, and I think through that at least it's sufficiently preserved to be considered whether the judge should have at least ruled on the objection of the government into Mr. Lopez's argument that this is the primary evidence. Thank you, Your Honor. I see we're at the very end. Thank you. Thank you, counsel. Mr. Rothblatt. May it please the Court. My name is Richard Rothblatt, and I represent the United States. This court should affirm defendant's convictions and the sentence imposed by the district court judge. With regard to the first issue and the voice identification testimony that was admitted at trial, I want to clarify how this case is distinguishable from Jones, and that's in a variety of ways. First, Jones addressed a defendant who was convicted primarily on voice identification testimony stemming from a 10- to 15-minute conversation overheard by a detective, which was only introduced during the rebuttal case of the government. The Seventh Circuit called that evidence strange. This case is nothing like that. Here we have a variety of pieces of evidence that form in addition to the voice identification testimony. There were four cooperating witnesses, including one who personally identified the defendant as being a leader in the drug trafficking organization, who had trained that cooperator on how to unload tractor-trailers to remove drugs and send back drug proceeds down through the United States. Several other cooperating witnesses who identified defendant's role in shipping tractor-trailers that were empty. This evidence was only complemented by voice identification testimony. The voice identification testimony in the recordings, too, in particular with regard to Agent Alarcon, Agent Alarcon, as well as two other witnesses, provided voice identification testimony. The heart of the voice identification testimony came from voice exemplars, stipulated voice exemplars, which contained minutes of the defendant speaking that these witnesses were able to compare to the recordings, the Yanez Barrera calls. So the additional testimony about overhearing the defendant speaking in a loud voice during court was simply a complement by one witness of three who provided voice identification testimony. So that makes this case significantly different than the issues encountered by this court in Jones. The court asked questions about the Fifth Amendment issues and whether or not there would be a conflict of interest here with regard to potential testimony by defense counsel. But as Judge Kirsch highlighted, there were a variety of ways this issue could have been teased out by defense counsel at trial that were not explored. There was initially a voir dire of Agent Alarcon outside the presence of the jury when this issue first emerged. Defense counsel at that point didn't even object to Agent Alarcon's basis of testimony of having overheard the defendant speaking in court in addition to using the voice exemplars. There was no further colloquy about the nature of those communications, the length, where they took place, who was present. Then during cross-examination at trial by Agent Alarcon, defense counsel again asked no questions about the nature of those communications. He could have done that. He could have requested an ex parte hearing. None of these options were explored. Further, there were several other witnesses who could have been present if the defendant intended to challenge that he made statements in court that could have been overheard. Why didn't the government directly address the question when invited by the court as to whether or not the agent overheard the conversation or communication with the attorney? The government had two or three opportunities to do that, including in a written submission, and didn't do it. Well, the first opportunity was during trial when the defense counsel objected to the government's question about what language the communication occurred in, and the court sustained that objection. The parties then went to a sidebar, and at that point the court indicated that it didn't want the government to get into the substance of the communication out of theoretical concern that it could have. But this isn't substance that we're talking about. These are kind of the foundational aspects of it, and the court didn't say that. The court did not preclude the government from going into the foundational elements. The government didn't feel it was necessary in light of the primary basis of Agent Alarcon's voice identification testimony was his review of the stipulated voice example. The additional information that he had overheard the defendant speaking in court for a short period of time in a very loud voice wasn't the primary basis of Agent Alarcon's testimony. It constituted approximately two to three questions during his direct examination before he laid the foundation for admitting the demonstrative transcripts. The District Court, and Judge Sainte, your questions earlier highlighted that the District Court judge found there is simply no evidence in the record to support that these were attorney-client privileged communications, that they were attorney-client communications whatsoever, which again distinguishes this case from Jones. And one last point on Jones is that in Jones the primary objection by defendant was that the communication itself, the 10 to 15 minute conversation that served as the basis for the detective's voice identification, had occurred whatsoever. At no point in this trial or in the post-trial briefing has the defendant ever claimed that he did not speak in court. So there's a fundamental distinction between this case and Jones. I want to go back to my other question too before we move on. The court invited the government to address this question, both orally in court at a hearing and in a written submission, and the government didn't address it. Why not? The government did address this in a submission. The government never directly answered the question if the agent was basing his testimony on having overheard the defendant speaking with his lawyer. Yes, that's true, Your Honor. That's my question. Why didn't the government answer that when the court specifically invited the government to do so? I think in order to do that at the time, Your Honor, the government would need to have had an evidentiary hearing or some kind of submission by the agent about particularly what he heard. There simply wasn't a record of that, and the government didn't feel that there was a need to make a record on that because, again, it didn't form as the primary basis of his voice identification. This is nothing like Jones, and this court has made clear that overhearing a defendant speaking in court is an appropriate basis for voice identification. So none of the issues that the defense counsel theoretically poses as being implicated by the agent's testimony actually applied here. With regard to the transcript issue, first, it is the government's position that the defendant has waived that issue. On numerous occasions throughout the trial, the court invited the defendant to offer instructions, to ask for instructions. In particular, when the demonstrative transcripts were introduced by the government, the court asked what instructions the parties wanted to give. And Sua Sponte decided to give an instruction on opinion testimony and how the jury need not accept lay opinion testimony about voice identification. At that point, defense counsel did not offer any instruction, the demonstrative pattern instruction, or any modification of the instruction. Defense counsel now says that in light of the government's objection to questioning of the Spanish translator, the court should have either ruled on that objection or Sua Sponte modified the pattern instruction. But nothing that the district court judge did here was inappropriate with regard to the instructions. So to the extent that argument has not been waived, the district court properly instructed the jury about how to treat the various transcripts. As Judge Kirsch highlighted before, the recordings were evidence, but so were the transcripts. As this court has said on numerous occasions, in a foreign language transcript case, the transcripts are integral, important evidence for the jury to consider, because they cannot independently interpret or translate those recordings based on personal knowledge. Is the instruction in any way inconsistent with our case law in Nunez and Cruz-Reya? They talk about the audio being the primary evidence, and Cruz-Reya suggests that the translation is to give you an assistance in understanding the evidence as it comes from the audio. Is there something there inconsistent with the instruction? No, Your Honor. First, the pattern instructions were given here, pattern instruction 3.15, which is And that's what I'm asking. Is the pattern instruction inconsistent in any way with Nunez and Cruz-Reya? No, it's not, Judge, and that's for two reasons. First, the pattern instruction does tell the jury that the recordings are the evidence, and it also tells the jury that they don't have to accept the translation. And in doing that, they can weigh the credibility, the skill, the experience of the translator. So theoretically, the jury could take the recordings, listen to the recordings, and say, I don't believe these transcripts are appropriate for one reason or another. The translator doesn't have the necessary experience. That's a little bit of a problem in this case because there's no countervailing evidence. Maybe our jury instructions do need a little work in this, but when the transcripts go in and they're English, and there's no challenge to what's in the transcript, and the calls are in Spanish, and we're telling the jurors, if you speak Spanish, you can't use your own Spanish language interpretation to amend the transcripts. And when the transcripts are unchallenged, then I don't know what the jury, you know, it's a little bit weird, and maybe the jury instruction does need a little work. It is a little inconsistent with Cruz-Rey, and maybe that needs a little cleanup. Two points on that. The first is, I think this court is, I think you're right that first, defendant could have, and Judge Blakey addressed this, defendant could have offered his own expert to provide translations and say. . . Or just cross-examine to the government expert. He didn't have to put his own expert on it. He could just cross-examine the government. You don't speak Spanish. Yes, I do. Well, then he could argue to the jury, she doesn't even speak Spanish. The jury will disbelieve it, but he can argue it. And he did, Judge. He did cross-examine the Spanish translator in this case to try to establish that certain words may have different interpretations and different meanings. He could have offered his own expert witness to provide countervailing translations that the jury could have considered. I'm worried about that line of argument, though, because he doesn't have to. He doesn't have to put on a defense. But my second argument to that, Judge, would be that in this case, the recordings weren't all of the highest quality. And defendant published. . . As usual, right? Yeah, there were certain portions that were a bit muffled, and the jury could have listened to certain portions of the recordings and say, I don't believe that the translator could have actually . . . Heard it. Heard this portion and translated it. So there was the independent ability for, if not to assess the language and the nature and the words chosen by the translator, to assess the ability of the translator to make translations at all. So I believe that the pattern instruction here did apply. It was appropriate. It was appropriately given. And the district court went out of its way to ensure that the jury was carefully assessing the evidence that the government had presented that identified the speakers, which was the real issue here. Who were the speakers on the call? Why didn't the government move those transcripts into evidence when the speaker had been identified? You kept them as demonstratives. We did, Judge, yeah. And this court has said in Breland and in Cruz Reya that the government may introduce transcripts of the speakers identified once that evidence has come in. Because that issue was so hotly contested here, out of an abundance of caution, the government kept those demonstrative transcripts separate and simply published them during trial but then only sent back the unidentified speakers. Because it seems that you laid the foundation to move it into evidence, whether what weight the jury decided to give to it is up to the jury based on the cross-examination. But it seemed odd that you didn't move it in. Judge, that was done out of an abundance of caution. The government still argued it in its closing arguments. But that in some way inoculates the argument that defense counsel is trying to make here, that there was some prejudicial effect from the introduction of the demonstrative transcripts or the instructions given. Those demonstrative transcripts didn't even go back with the jury. The argument was made. The evidence was presented. But it was cautiously done to enable the jury to make its own determination based on reviewing the translated transcripts without the speakers identified. Unless there are further questions from the panel, the government maintains that the court should affirm the convictions and sentence of the defendant in this case. Thank you, counsel. Ms. Zarcoe, I'll give you one minute for rebuttal. Thank you, Your Honor. Just briefly on the issue of whether the trial attorney could have introduced certain witnesses to explore what was being said in the conversations between defendant and someone in Spanish to figure out, I want to point out one thing, that I think U.S. Jones already explored that possibility and specifically said that on a short notice the defense attorney and defendant should not have to rely on trying to figure out who those witnesses could be. And that is the crux of our argument here. This happens on a very short notice. If this was in our position that it was a conversation between the defendant, however short, and his attorney, that the attorneys should not have to put themselves, defendants, or look for potential witnesses on a very short notice that they could present and explore this conversation, what it was, how loud it really was, was it loud enough and long enough to actually identify the defendant's voice. And that is the crux of the argument and why I think calling witnesses... Thank you, counsel. Thank you. Ms. Zarcoe, the court appreciates your willingness to take the appointment in this case. Thank you for your assistance. The case is taken under advisement.